IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,981

STATE OF KANSAS,
*Appellee*,

v.

JAMES K. KAHLER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under the first step of the two-part test for prosecutorial error set forth in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), an appellate court analyzes whether the prosecutor's statements fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.

2.

It is within a prosecutor's permissible latitude to object that the defense is about to go beyond the admitted evidence in its summation to the jury.

3.

An appellate court will review allegations of judicial misconduct that were not preserved at trial when the defendant's right to a fair trial is implicated. Further, K.S.A. 2016 Supp. 21-6619(b) provides the authority for this court to notice unassigned errors in death penalty appeals.

1

4.

The appellate standard of review on claims of judicial misconduct is unlimited. The reviewing court will examine the particular facts and circumstances of the case to determine whether the judicial conduct, including comments other than jury instructions, manifests bias, prejudice, or partiality, or otherwise significantly undermines the fairness or reliability of the proceedings.

5.

A district judge is charged with preserving order in the courtroom and with the duty to see that justice is not obstructed by any person. A judge may caution venire persons to refrain from making comments that could contaminate the jury pool, but the better practice would be to clarify that panel members will be provided an opportunity to raise any personal concerns they may have outside the presence of the other venire members.

6.

A trial judge has broad discretion to control the courtroom proceedings, but when it is necessary to comment on a counsel's conduct, especially in the jury's presence, the judge should do so in a dignified, restrained manner; avoid repartee; limit comments and rulings to those reasonably required for the orderly progress of the trial; and refrain from unnecessarily disparaging persons or issues. Specifically, when a judge finds it necessary to request that counsel complete a voir dire examination more quickly, the better practice would be for the judge to make the request out of the presence of the venire panel.

7.

It is misconduct for a judge, after having admonished defense counsel during opening statement about making statements without witness support, to give a special instruction after the opening statements, advising the jury that statements, arguments, and

remarks of counsel are not evidence and may be disregarded if not supported by the evidence, when the instruction is prefaced by the judge's remark that the court normally does not do so.

8.

While the trial court is allowed to question witnesses from the bench in order to fully develop the truth, the better practice is for the judge to discuss the matter with counsel outside the presence of the jury and request counsel to pose the questions necessary to clarify the matter.

9.

A trial judge's erroneous ruling on a party's objection, standing alone, is not grounds for a finding of judicial misconduct. A trial judge's statement "it's improper" when ruling on an objection is not per se misconduct.

10.

Remarks to the jury that are legally and factually accurate and that do not demonstrate bias, prejudice, or partiality to either party do not constitute judicial misconduct.

11.

The party asserting judicial misconduct has the burden to show that any misconduct found to exist actually prejudiced that party's substantial rights.

12.

Under the facts of this case, the district court erred when it refused to give the defense's requested instruction on expert witness credibility because the instruction was legally appropriate and factually supported. Therefore, the next step on appellate review

3

is to apply the harmless error paradigm set out in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

13.

K.S.A. 22-3220, replacing the traditional insanity defense with a mens rea approach, does not violate the defendant's right to due process under the United States or Kansas Constitutions.

14.

It is not legally appropriate to give a felony-murder instruction as a lesser included offense instruction for a capital murder charge, and a trial court does not commit clear error by failing to give such an instruction sua sponte.

15.

Prohibiting the defense from asking prospective jurors about their views on the death penalty in the presence of the other venire persons is not erroneous when defense counsel is permitted to make such an inquiry individually, outside the presence of the other venire persons.

16.

Cumulative trial errors, when considered collectively, may require reversal of a defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. The cumulative error rule does not require reversal if the evidence is overwhelming against the defendant.

17.

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishments. The United States Supreme Court has identified three subcategories of categorical proportionality Eighth Amendment challenges: (1) Based on the nature of the offense; (2) based on the characteristics of the offender; and (3) based on a combination of the offense and the offender, implicating a particular type of sentence as it applies to an entire class of offenders.

18.

In analyzing an Eighth Amendment categorical proportionality challenge based on an offender's characteristics, the court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the court must determine in the exercise of its own independent judgment whether the punishment in question is unconstitutionally cruel and unusual.

19.

Pursuant to our decision in *State v. Kleypas*, 305 Kan. 224, 335-37, 382 P.3d 373 (2016), we again decline to declare a categorical prohibition against imposing a death sentence based on the broad classification of mental illness.

20.

It is not unconstitutionally duplicative to use the same conduct of the defendant to establish both an element of capital murder and the existence of an aggravating circumstance.

21.

The aggravating factor that the crime was committed in a heinous, atrocious, or cruel manner is not so vague and duplicative that it fails to narrow the class of persons who are constitutionally death penalty eligible.

22.

The standard of review on appeal as to the sufficiency of evidence regarding an aggravating circumstance is whether, after review of all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt.

23.

Shooting deaths are not inherently heinous, atrocious, or cruel. But where a defendant previously electronically stalked, threatened physical harm, and allegedly battered one of the victims, before methodically going through a house shooting each of the victims in turn; and where the victims were conscious long enough to suffer the physical pain of their injuries and the mental anguish of their impending death; while also being aware that other victims were being shot, the evidence was sufficient to support the jury's verdict that the capital murder was committed in a heinous, atrocious, or cruel manner.

Appeal from Osage District Court; PHILLIP M. FROMME, judge. Opinion filed February 9, 2018. Affirmed.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause, and *Sarah Ellen Johnson*, of the same office, was with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Natalie Chalmers,* assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

PER CURIAM:  A jury convicted James Kraig Kahler of aggravated burglary and capital murder under K.S.A. 21-3439(a)(6) for fatally shooting his wife, his wife's grandmother, and his two daughters. Kahler appeals the capital murder conviction and the ensuing sentence of death; our review is automatic under K.S.A. 2016 Supp. 21-6619.

Kahler raises 10 issues on appeal. Some of the raised issues present questions decided unfavorably to Kahler in prior cases, and Kahler presents no new argument or authority that would persuade us to change our holdings on those issues. Likewise, Kahler fails to convince us that his other challenges warrant a reversal of his capital murder conviction or a vacation of his death sentence. We summarize our specific holdings as follows:

- The State did not commit prosecutorial error by objecting during Kahler's closing argument.
- The district court judge engaged in one incident of judicial misconduct that does not require reversal.
- The district court judge erred in refusing to give a requested expert witness instruction, but the error was harmless.
- K.S.A. 22-3220, which adopted the mental disease or defect defense, did not unconstitutionally abrogate Kansas' former insanity defense.
- Because felony murder is not a lesser included offense of capital murder, the district court judge did not err in failing to give a lesser included instruction on felony murder.
- The district court judge did not prohibit defense counsel from questioning prospective jurors during voir dire about their views on the death penalty.

- The cumulative effect of trial errors did not substantially prejudice Kahler so as to deny him a fair trial.
- The Kansas death penalty is not a categorically disproportionate punishment for offenders who are severely mentally ill at the time they commit their crimes.
- The two aggravating factors relied upon by the State to support the death penalty are not unconstitutionally vague or duplicative.
- There was sufficient evidence presented by the State to establish that the killings in this case were committed in a heinous, atrocious, or cruel manner.

Consequently, we affirm Kahler's capital murder conviction and his sentence of death.

## FACTUAL AND PROCEDURAL BACKGROUND

A recitation of some family history preceding the murders is necessary to put Kahler's crimes in context. In 2008, the Kahler family—husband, Kahler; wife, Karen; teenage daughters, Emily and Lauren; and 9-year-old son, Sean—was living in Weatherford, Texas. Kahler was the director of the public utilities department, and Karen was a personal trainer. Both adults had successful careers. Acquaintances described the Kahlers as a perfect family. Kahler was extremely proud of his family; it was his top priority.

That summer, Kahler took a new job as the director of water and light for the city of Columbia, Missouri. He moved to Columbia, while Karen and the children stayed in Texas, planning to follow him in the fall. Before Kahler left for Columbia, Karen told

him she was interested in experimenting by engaging in a sexual relationship with a female trainer with whom she worked. Kahler assented to the sexual relationship.

Kahler thought the affair would end when Karen and the children moved to Missouri; however, it did not. At a New Year's Eve party in Weatherford, Kahler was embarrassed by Karen and her lover's behavior, and the evening resulted in a shoving match between the Kahlers. The pair attempted marriage counseling, but by mid-January 2009, Karen filed for divorce. In mid-March, Karen made a battery complaint against Kahler, which resulted in an arrest warrant being served on Kahler at a city council meeting. Because Kahler held public office, his arrest was widely publicized. Shortly thereafter, Karen took the children and moved out of Kahler's residence.

The disintegration of his marriage and family relationships affected Kahler's conduct, both personally and professionally. Kahler's supervisor and another colleague both noted Kahler's increasing preoccupation with his personal problems and decreasing attention to his job. By August 2009, the city had fired Kahler. Concerned about Kahler's well-being, his parents traveled to Columbia and moved Kahler back to their ranch near Meriden, Kansas.

Later that year, at Thanksgiving, Sean joined Kahler at the family ranch in Meriden, while Karen and the girls went to Karen's sister's home in Derby. The family had a long-standing tradition of spending the weekend after Thanksgiving at the home of Karen's grandmother, Dorothy Wight, in Burlingame, Kansas. Arrangements had been made for Karen to pick up Sean in Topeka on Saturday, November 28, and take him to Wight's residence in Burlingame. That morning, Sean, who had been enjoying his time at the Meriden ranch, fishing and hunting with his father, called Karen to ask if he could stay at the ranch. Karen denied permission, and while Kahler was out running an errand, Kahler's mother took Sean to meet Karen in Topeka.

Between 5:30 and 6 that evening, in Burlingame, a neighbor of Wight's called police about a man in a red Ford Explorer near her home whom she suspected of criminal activity. The Explorer was later determined to be Kahler's vehicle. Around 6 p.m., Sean and Karen were standing in the kitchen of Wight's home, while Emily, Lauren, and Wight were elsewhere in the house. Kahler entered Wight's house through the back door, into the kitchen, and started shooting. He shot Karen twice but did not attempt to harm Sean. After Kahler moved through the kitchen to shoot the other victims, Sean ran out the back door and to a neighbor's home where the police were called.

About the same time, Wight's Life Alert system activated a call for emergency assistance and that in turn resulted in a 911 call to law enforcement. The system also created a recording of the events in the house.

When officers arrived, Karen was lying on the kitchen floor, unconscious and barely breathing. Emily, who had also been shot twice, was dead on the living room floor. Wight was sitting in a chair in the living room, suffering from a single gunshot wound to the abdomen, but conscious. Lauren, who had been shot twice, was found upstairs, conscious but having trouble breathing. Kahler was no longer in the house, but both Wight and Lauren told the first responders that Kahler was the person who had shot them. Karen and Lauren died from their wounds later that evening. Wight survived a few days but ultimately succumbed to her wounds as well.

Kahler managed to elude law enforcement that evening but was found walking down a country road the next morning. He surrendered without incident. The State charged Kahler with one count of capital murder, or, in the alternative, four counts of premeditated first-degree murder, as well as one count of aggravated burglary for the unauthorized entry into Wight's house.

10

At trial, the defense did not dispute that it was Kahler who shot the victims. Rather, the defense attempted to establish that severe depression had rendered Kahler incapable of forming the intent and premeditation required to establish the crime of capital murder. The defense presented testimony from Dr. Stephen Peterson, a forensic psychiatrist, who testified that Kahler was suffering from severe major depression at the time of the crime and that "his capacity to manage his own behavior had been severely degraded so that he couldn't refrain from doing what he did." Defense counsel, however, did not specifically ask Dr. Peterson whether Kahler had the capacity to premeditate or to form the requisite intent to commit the crimes. The State countered with the expert testimony of Dr. William Logan, also a forensic psychiatrist, who opined that Kahler was capable of forming the requisite intent and premeditation.

During closing arguments, defense counsel asserted that Kahler was incapable of forming the requisite premeditation or intent at the time of the killings. In return, the State argued that the defense expert had failed to specifically address that point, while the State's expert had directly stated that Kahler *was* capable of premeditating the murder and forming the requisite intent to kill.

The jury convicted Kahler of capital murder. After hearing additional evidence in the penalty phase, the same jury recommended the death sentence.

As noted, Kahler raised 10 issues on appeal, all of which are argued in the context of the capital murder conviction and the ensuing death sentence. Consequently, we will review only that conviction and sentence and will address each issue in the order presented.

# I. PROSECUTORIAL ERROR

In his first issue, Kahler alleges that the prosecutor engaged in prosecutorial misconduct when she objected during defense counsel's closing argument. Defense counsel was discussing the recording produced during the commission of the crime by the Life Alert system. A male voice, presumably Kahler's, had been captured on the recording. Defense counsel was about to state the words spoken by that male voice, when the prosecutor interrupted, objecting that defense counsel's argument constituted improper unsworn testimony based on what defense counsel *thought* the voice had said. The district court sustained the objection.

*Standard of Review/Error Analysis*

At oral argument, both parties acknowledged that this court's decision in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), although decided after the briefs in this case were filed, now controls the analysis of this issue. *Sherman* ended the practice followed by *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004) *overruled by Sherman*, 305 Kan. 88, of attempting to factor a prosecutor's ill will and gross misconduct into the prejudice step of the two step error/prejudice analysis when reviewing an allegation of prosecutorial misconduct on appeal. *Sherman* substituted an analysis that is focused on the defendant's due process right to receive a fair trial.

*Sherman* continues to utilize a two-step error/prejudice framework and the first step—the error analysis—remains the same. See *State v. Kleypas*, 305 Kan. 224, 316, 382 P.3d 373 (2016). "Under the first step, we will continue to analyze whether the prosecutor's statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the

12

defendant's constitutional right to a fair trial.'" 305 Kan. at 316 (quoting *Sherman*, 305 Kan. 88, Syl. ¶ 7). If error occurred, the State must prove beyond a reasonable doubt that "'the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Kleypas*, 305 Kan. at 316 (quoting *Sherman*, 305 Kan. 88, Syl. ¶ 8).

*Analysis*

Kahler maintains that his right to a fair trial was violated when the prosecutor objected to defense counsel's attempt in closing argument to repeat what was said by the male voice on the Life Alert recording. The prosecutor's objection was based on the assertion that defense counsel was not allowed to state his opinion of the content of the tape and doing so amounted to improper testimony.

At oral argument, Kahler argued that the objection was error because it was motivated by bad faith and attempted to liken it to a misstatement of law. In other words, Kahler attempts to move the bad faith analysis previously conducted under the prejudice step to the error step. But ill will has never been part of the error determination. And *Sherman* is clear that measuring prejudice by attempting to discern the prosecutor's motivation has been problematic in the past and is no longer appropriate to our analysis of prosecutorial error within a criminal appeal. Thus, the question before the court under *Sherman*, as it was under previous caselaw, is simply whether making an objection, even one based on an erroneous application of law, was outside the wide latitude afforded the prosecutor in making her case to the jury.

We conclude that it is within the prosecutor's permissible latitude to object that the defense is about to go beyond the admitted evidence in its summation to the jury. As we discuss below, the district court's ruling on the prosecutor's objection may have been

13

erroneous. But this fact has no bearing on the determination of whether the objection itself was prosecutorial error.

## II. JUDICIAL MISCONDUCT

Kahler alleges that the district court judge engaged in misconduct throughout the trial, which cast his defense in a bad light, favored the State's case, and denied him his right to a fair trial. Kahler points to six specific instances to illustrate his argument.

At trial, defense counsel failed to object to any of the claimed misconduct. But an appellate court will review allegations of judicial misconduct that were not preserved at trial when the defendant's right to a fair trial is implicated. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010); *State v. Tyler*, 286 Kan. 1087, 1090, 191 P.3d 306 (2008); *State v. Brown*, 280 Kan. 65, 70, 118 P.3d 1273 (2005). In addition, we are statutorily obligated to review this issue because of the death sentence imposed. K.S.A. 2016 Supp. 21-6619(b) (court shall review all asserted errors in a death sentence appeal).

*Standard of Review*

Our standard of review on claims of judicial misconduct is unlimited. We examine the particular facts and circumstances of the case to determine whether judicial conduct including comments, other than jury instructions, rise to the level of judicial misconduct. *Kemble*, 291 Kan. at 113.

*Analysis*

The Kansas Code of Judicial Conduct (KCJC) requires a judge to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Canon

14

1, Rule 1.2 (2017 Kan. S. Ct. R. 431); see *State v. Miller*, 274 Kan. 113, 128, 49 P.3d 458 (2002) ("judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions").

An erroneous ruling by a judge, standing alone, will not establish judicial misconduct. Canon 2, Rule 2.2, Comment [3] (2017 Kan. S. Ct. R. 433) (good-faith errors of fact or law do not violate KCJC). Rather, the reviewing court will look for conduct that manifests bias, prejudice, or partiality, or otherwise significantly undermines the fairness or reliability of the proceedings. Cf. Canon 2, Rule 2.3, Comment [1] (2017 Kan. S. Ct. R. 434) ("judge who manifests bias or prejudice in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute"). The complaining party has the burden to establish that judicial misconduct occurred and that the misconduct prejudiced the party's substantial rights. *Kemble*, 291 Kan. at 113. "'If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial.'" *Brown*, 280 Kan. at 70 (quoting *Miller*, 274 Kan. at 118).

With those ground rules to guide us, we turn to the individual instances alleged by Kahler to be judicial misconduct, followed by a consideration of their cumulative effect.

A. *Warning a voir dire panel against outbursts of opinion*

Kahler first complains of remarks the district judge made to a panel of the jury pool during voir dire. Four panels of venire members were questioned. The remarks Kahler finds objectionable were made to the third panel and were part of the district judge's preliminary remarks explaining voir dire. In addition to asking the panel members

to speak clearly for the court reporter and to pay attention to all the questions asked whether directed specifically to them or not, the district judge added the following caution:

"It's also important that you be careful. We want you to talk frankly, we want you to answer questions and speak from your heart, but we don't want any outbursts of opinions that might prejudice the rest of this panel so before you speak in any manner like that, think twice. And I warned you, anyway, regarding that, regarding your personal opinions."

Kahler argues these remarks to the third panel dissuaded the panel members from expressing their opinions and inhibited the voir dire process. The State counters that, put in context, the district judge's remarks were nothing more than a reasonable admonition to prevent one of the potential jurors from tainting the rest of the panel and were well within the district judge's responsibility to control the courtroom. We agree with the State.

A district judge is charged with preserving order in the courtroom and with the duty to see that justice is not obstructed by any person. *State v. Rochelle*, 297 Kan. 32, 36-37, 298 P.3d 293 (2013). The record establishes that throughout the voir dire of the first two panels, the district judge had expressed concern about questioning by the defense that might elicit panel members' views on the death penalty. We have approved of similar remarks in other cases where the district judge sought to prevent contamination of the jury pool. See, e.g., *State v. Aikins*, 261 Kan. 346, 365, 932 P.2d 408 (1997) (trial court warned potential jurors not to "blurt out" any information they might have about the case), *disapproved on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012); *State v. Hayden*, 281 Kan. 112, 130, 130 P.3d 24 (2006) (district judge cautioned

16

jurors to tread carefully so that other potential jurors would not be prejudiced by intemperate comments and asked very specific questions so that venire members did not spontaneously volunteer unnecessary prejudicial information).

We note, however, that the better practice would have included a clarification by the district judge that panel members would have an opportunity to raise any personal concerns outside the presence of the other venire members. Cf. *Aikins*, 261 Kan. at 365 (defense counsel encouraged potential jurors to approach judge individually if they had racial prejudices which they did not want to express in front of panel). But it is clear that the district judge's failure to include such a clarification to the third panel was an oversight, as his comments to the fourth panel included just such a statement.

In sum, we find no misconduct in the district judge's comments to the third panel.

B. *Asking defense counsel to move along*

Kahler complains that the district judge committed misconduct when he asked defense counsel to speed up his voir dire questioning. During the defense voir dire of the third panel on the second morning of jury selection, the district judge told defense counsel, "we need to move through this a little faster if we can. I realize you have a right to all your questions but we're running behind now." Kahler argues this shows bias because the judge did not make a similar request of the State and the defense questioning had not exceeded the time afforded the prosecutor.

The trial judge has broad discretion in controlling the courtroom proceedings. *Rochelle*, 297 Kan. at 37; *Kemble*, 291 Kan. at 114. "When it is necessary to comment on counsel's conduct, especially in the jury's presence, the trial court should do so in a dignified, restrained manner; avoid repartee; limit comments and rulings to those

17

reasonably required for the orderly progress of the trial; and refrain from unnecessarily disparaging persons or issues." *State v. Hudgins*, 301 Kan. 629, 638, 346 P.3d 1062 (2015).

Kahler argues that his counsel took no more time for voir dire than the prosecution had taken. For support, Kahler compares the number of transcript pages that contain voir dire questioning by the prosecutor to the number taken by defense counsel's questioning. This method of quantifying time is inherently unreliable. Cf. *Hudgins*, 301 Kan. at 637 (trial judge requested defense counsel to "pick up the pace" after defense counsel was silent for about 3 minutes). More to the point, however, there is nothing in the district judge's comments that reflects negatively on defense counsel's conduct. The statement concerned the orderly progress of the trial, and nothing suggests that the statement was delivered in anything less than a dignified and restrained manner. The statement was a request, not an order, and clearly recognized that defense counsel was entitled to ask his questions.

We once again note the better practice, which would have the district judge make such administrative requests out of the presence of the venire panel. Nonetheless, merely requesting trial counsel to move a little faster, if possible, does not amount to judicial misconduct. Cf. *Hudgins*, 301 Kan. at 638-39 (remark, at worst, was a mild warning within the proper exercise of a district court's authority to control voir dire and avoid undue delay).

C. *Comments on instructing the jury following opening statements*

Both parties gave relatively straightforward opening statements. The prosecutor gave a brief overview of the shootings and then summarized testimony he expected to elicit from each of the State's witnesses about the crime and the crime scene. The defense

focused on painting a picture of the events that led up to the crime: Kahler's professional success, the many happy years of the Kahlers' marriage and family life, the breakdown of the marriage, and Kahler's obsession with saving it.

There were no objections during the State's opening; however, the State objected three times during Kahler's opening. After defense counsel had attributed statements to Karen, the prosecutor asked to approach the bench. At the bench, the prosecutor lodged an objection based on hearsay. The district judge sustained the objection and instructed Kahler's counsel to set out the expected evidence and not to testify. The objection and discussion were had out of hearing of the jury.

Almost immediately after the bench conference, the prosecutor objected a second time, saying only "same objection" when counsel for Kahler again attributed statements to Karen. This time the district judge responded within hearing of the jury: "All right. [Defense counsel], we talked. Unless you intend to call witnesses to support what you're saying, they're not allowed."

Later, the prosecutor requested to approach the bench again to lodge an objection to defense counsel using the word "crazy" to describe Kahler's behavior. The discussion and the judge's admonition not to use the word were outside the jury's hearing.

Immediately following Kahler's opening statement, the district judge said:

"All right. Ladies and gentlemen of the jury, I'm going to read an instruction to you at this time. *I normally don't do this, but I am going to ask that you listen carefully.* This is one of the instructions that will be given to you later but I wish to give it to you now also. That statement is: Statements, arguments, and remarks of counsel are intended to help

19

you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." (Emphasis added.)

Kahler argues the district judge's comments prior to the actual instruction showed bias—particularly the comment that the judge did not normally give the instruction but wished to do so this time. Kahler argues that it amounted to a negative comment on defense counsel's credibility.

The State focuses only on the instruction and ignores the judge's comments preceding the instruction. It argues the instruction itself was a fair and accurate statement of the law. It also points to K.S.A. 2016 Supp. 22-3414(3), which provides "the judge, in the judge's discretion, after the opening statements, may instruct the jury on such matters as in the judge's opinion will assist the jury in considering the evidence as it is presented." But the State fails to acknowledge that the district judge gave the jury a set of instructions prior to opening statements, which included an instruction on considering only testimony and exhibits admitted into evidence and an instruction that it is up to the jury to determine the weight and credit to be given the testimony of each witness.

Given the context of the prosecution's objections during the defense's opening statement, the judge's comment undoubtedly brought special attention to the instruction. Moreover, given the timing of the district court's comment, the jury's attention would undoubtedly have been directed to the defense's opening argument. The jury had just heard the district judge admonish defense counsel by saying, "Unless you intend to call witnesses to support what you're saying, they're not allowed." When the district judge commented immediately on the heels of the opening statements, he underscored his

20

suspicion that the defense would not be able to introduce evidence that would allow the jury to attribute certain statements to Karen. This belief should not have been revealed to the jury.

This court has previously warned district judges to "limit[] comments and rulings to what is reasonably required for the orderly progress of the trial, and refrain[] from unnecessary disparagement of persons or issues." *State v. Miller*, 274 Kan. 113, 128, 49 P.3d 458 (2002). Here, the comment added nothing to the orderly progress of the trial—the instruction could have been given without editorial comment or explanation. The district judge erred in making the comment.

Error alone does not require reversal, however. "'The question is whether [the defendant]'s substantial rights to a fair trial were prejudiced by the court's statements.'" *State v. Cheever*, 306 Kan. 760, 793-94, 402 P.3d 1126 (2017). Here, the district judge's isolated comment did not show the type of judicial bias that denies a fair trial. See *Miller*, 274 Kan. at 129 (finding district judge's numerous statements accumulated to deny a fair trial). On occasion, district judges reveal, usually unintentionally, a bias on an issue. Consequently, district judges routinely instruct the jury, as the judge did in this case, that "I have not meant to indicate any opinion as to what your verdict should be by any ruling that I have made or anything that I have said or done." See PIK Crim. 4th 50.060. Nothing suggests the judge's isolated comment here influenced the jury's consideration or misdirected the jury's focus.

Indeed, the instruction given after the judge's ill-advised comment pointed the jury exactly where it needed to go: The instruction focused the jury on the evidence. That is the point of the instruction, which is often given repeatedly through a trial. Consequently, we hold the judge's comment to be harmless error under either the constitutional or

21

nonconstitutional harmless error standard. See *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

D. *Personally questioning a witness*

The prosecution's theory at trial was that Kahler shot the victims with a .223 caliber rifle or "long gun." Shell casings found at the scene and bullets found in a clip near where Kahler was arrested were .223 caliber. The gun used in the murders, however, was never found. During testimony, a Shawnee County deputy testified that she was asked to look for a "long gun" in Kahler's impounded vehicle as part of the investigation. She testified that she was unable to find a gun but did find an empty box for a Remington .223. She testified she left the box in the car. The district judge apparently did not think this testimony was clear, and at the end of the prosecutor's questioning, questioned the witness himself:

"BY THE COURT: Q. And I will ask this just as a matter of clarification before the break; you mentioned an empty box Remington .223 caliber, is that correct, caliber?

"A. It was told to me that it was a Remington .223.

"Q. All right. Now when you said that, are you talking about a gun itself, or the bullet, or caliber of gun?

"A. It was the box for a gun.

"Q. Okay. You don't know whether it was a Remington brand gun or some other brand?

"A. I was told that it was a Remington .223.

22

"THE COURT: Counsel, you want to try to clarify that with her?

"[Prosecutor]: Sure.

. . . .

"[Prosecutor]: Q. You didn't find a weapon in the vehicle, did you?

"A. No.

"Q. You found a box that appeared to be a gun box?

"A. Yes.

"Q. And it listed a caliber of the weapon at the end of it?

"A. Yes.

"Q. And what was the caliber of the gun?

"A. It would have been .223.

"Q. And REM, is that reference to the caliber or the brand of gun?

"A. The brand of gun."

Later testimony clarified that the box was for a long gun and the serial number of the gun that would have come in that box was registered to Kahler. Kahler maintains the district judge aided the State in proving its theory that a long gun was used in the crime and the assistance had the effect of bolstering the State's case and credibility.

23

This court has allowed questioning of witnesses from the bench "based upon the premise that one of the functions of a trial judge is to accomplish the full development of the truth." *Kemble*, 291 Kan. at 114-15 (citing *State v. Hays,* 256 Kan. 48, 51, 883 P.2d 1093 [1994]). But we have cautioned that the practice must not result in the slightest suggestion of partiality or bias. *Kemble*, 291 Kan. at 114-15. For decades, we have expressed our view that the better practice is for the district judge to discuss the matter with counsel outside the presence of the jury and ask counsel to pose the questions necessary to clarify the matter. See *State v. Boyd*, 222 Kan. 155, 159, 563 P.2d 446 (1977); see also *Kemble*, 291 Kan. at 115; *Hays*, 256 Kan. at 52; *State v. Hamilton*, 240 Kan. 539, 547, 731 P.2d 863 (1987) (quoting *Boyd* and noting such a procedure will accomplish the full development of the truth without direct participation by the trial judge in the examination of the witness and hence any question as to the judge's bias may be avoided).

Although the better practice would have been for the district judge to follow the procedure set out in *Boyd*, we see no misconduct here because there was no suggestion of partiality. Although Kahler contends that the judge's questioning aided and bolstered the State's case, it is just as probable that by stepping in to clarify and suggesting to the prosecutor that he follow up with additional questions, the district judge's comments reflected negatively on the State's presentation. Kahler does not argue that the questions asked were improper, and they drew no objection from defense counsel at the time. We also note that the importance to the State's case regarding the type of gun used was nearly nonexistent given Kahler's defense was not based on denying the shootings. Ultimately, the judge did not assume the role of an advocate; he merely attempted to clarify a point he apparently felt was unclear—a point that was of virtually no importance to the trial. Consequently, we find no misconduct.

24

E. *Sustaining objection to closing comments about voice on tape*

We rejected Kahler's argument above that the prosecutor committed prosecutorial error by objecting to defense counsel's attempt to quote the male voice on the Life Alert recording. Here we address his argument that the district judge committed misconduct by sustaining the objection.

The transcript reflects the following:

"[By Defense Counsel]: . . . you're going to hear a male voice during this absolute chaos say . . .

"[Prosecutor]: Your Honor, I'm going to object. The tape's in evidence. And counsel's not allowed to testify and tell the jury what he thinks is on that tape.

"[Defense Counsel]: Your Honor, I can say what I think's on that tape. They've got the tape and if it doesn't say it—counsel just said what all these witnesses said. I'm certainly allowed to say what the tape says.

"THE COURT: I think it's improper. You cannot say what you think is on the tape.

"[Defense Counsel]: Well, can I say what is on the tape, Your Honor?

"THE COURT: They can listen for themselves.

"[Defense Counsel]: All right."

Kahler argues the district judge committed misconduct in two ways: first, by erroneously sustaining the objection and, second, by labeling defense counsel's conduct "improper."

The State maintains that counsel for Kahler was about to misrepresent the evidence. It argues there was no testimony as to what the male voice on the tape specifically said. And noting that the voice itself is barely discernible, the State argues anything counsel would have said in regard to content would not have been based on the evidence. Accordingly, the State contends the district court was correct to sustain the objection.

We disagree. The district court sustained the objection in error, if for no other reason than because it was premature. The record does not contain a proffer of the words that defense counsel thought were on the tape, so we cannot know for sure whether they comported with the admitted evidence. But we do know there was more evidence than the State acknowledges. In addition to the original recording itself, the record includes Dr. Peterson's report and the transcript contained on the enhanced CD, which indicate that the voice said, "I am going to kill her." So, if defense counsel was going to state that the male voice on the tape said "I am going to kill her," it would have been entirely proper for defense counsel to discuss that statement and any reasonable inferences to be drawn from it. See *State v. Irving*, 217 Kan. 735, 739-40, 538 P.2d 670 (1975) ("[a]rgument of counsel is to be confined to the questions at issue and the evidence relating thereto and such inferences, deductions and analogies as can reasonably be drawn therefrom."); cf. *State v. Bollinger*, 302 Kan. 309, 320-22, 352 P.3d 1003 (2015) (prosecutor's statement, during closing argument, asking jury to draw inferences from indistinct sound in background of 911 call that subjectively sounded like someone calling out, "help me," was not an impermissible comment on facts not in evidence, so as to amount to prosecutorial misconduct), *cert. denied* 136 S. Ct. 858 (2016); *State v. Schumacher*, 298 Kan. 1059, 1070-72, 322 P.3d 1016 (2014) (prosecutor did not improperly comment on a fact not in evidence when, during closing argument in murder prosecution, he suggested that clicking sound heard when gun was cocked in courtroom was the same clicking sound heard on video just prior to defendant's shooting of victim).

26

But an erroneous ruling by the district judge, standing alone, is not grounds for finding judicial misconduct. Canon 2, Rule 2.2, Comment [3] (2017 Kan. S. Ct. R. 433) (good-faith errors of fact or law do not violate KCJC). Something more is required. Here, Kahler argues that the words the district judge used in ruling on the objection denigrated the defense. But the words used to sustain the objection did not denigrate counsel personally. The phrase "it's improper" appears to be a reference to the form of the argument counsel was attempting to use. These are the words our opinions frequently use to characterize argument or conduct of counsel as impermissible. See, e.g., *Kleypas*, 305 Kan. at 316-17 (discussion with district court indicated prosecutor was making an effort to find the line between "proper and improper argument" on mercy); *Sherman*, 305 Kan. at 101 (noting that this court places the burden on trial courts to set aside verdicts that are based on "improper arguments"); *State v. Marshall*, 294 Kan. 850, 861, 281 P.3d 1112 (2012) ("[A] prosecutor's *improper comment* or *argument* can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel." [Emphasis added.]); *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000) ("Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility."); *Irving*, 217 Kan. at 740 ("It is improper for counsel in his argument to the jury to comment on evidence which was excluded by the court when offered.").

Granted, when we issue an opinion we are not speaking within earshot of the jury. But we believe juries can be expected to understand that objections will be made and ruled upon in terms of what is proper and what is or is not allowed without assuming nefarious purposes by counsel, at least not those beyond normal trial advocacy. We cannot fault the district judge for framing his ruling—although erroneous—in commonly used terms.

27

Accordingly, we find no judicial misconduct. We do, however, find that the district court's sustaining of the State's objection was an unassigned trial error. See K.S.A. 2016 Supp. 21-6619(b) (in death penalty appeal, court is authorized to notice unassigned errors). Given the record and the arguments before us, we do not find this error requires reversal standing alone.

F. *Discouraging the jury from asking questions during deliberations*

For his final allegation of judicial misconduct, Kahler alleges that, before sending the jurors to deliberate at the end of the guilt phase, the district judge discouraged them from asking any questions they might have during deliberations. The particular remarks Kahler complains of concerned what the jurors should do in the event they had questions. The judge stated:

"The bailiff will be outside the door here and if you have any questions you can knock on the door and communicate with her.

"Now I have given you the instructions[,] that's the law of the case. Counsel has presented the evidence, the facts of the case. You should apply the law to the facts. You have everything you need to decide this case. You should review the instructions for the answers to any questions you might have. *You should not have to ask any questions.* However, if you have a question there is a process that we must go through and you should be aware of that process. You can't just ask the bailiff to tell me your question so that I can run back there and give you an answer.

"The process that we must follow requires that any question that you might ask be in writing. And the presiding juror must prepare that question in writing, hand it to the bailiff, and I must then assemble counsel and the defendant and we must discuss the question to decide whether we are able to give you an answer and, if so, what that answer should be. *My experience as a Judge has been that although sometimes we are able to*

28

*give jurors answers, for the most part the answer you're going to receive to most questions will be refer to your instructions for advice.*" (Emphasis added.)

Kahler focuses on the italicized comments and argues they demonstrated impatience with the steps necessary to meet the due process and Eighth Amendment requirements of a capital case. He points to K.S.A. 22-3420(3) to argue the jury had a right to ask questions. At the time of trial, K.S.A. 22-3420(3) provided:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

The remarks in this case were both legally and factually accurate; the jury was informed that questions could be asked; and the process that would be used to answer them was explained. The comment that the jury should not have to ask any questions, in context, appears to be a statement that the jury had the necessary information to reach a decision. The statement was an encouragement to the jurors to review the instructions before asking a question rather than a discouragement from asking any questions at all. The statement informed the jurors that most questions would likely be answered by referring the jury back to the instructions. Nothing in the comments demonstrated bias, prejudice, or partiality toward either party. We find no misconduct.

G. *No cumulative prejudicial effect*

As noted above, we have typically required the party asserting judicial misconduct to show that any misconduct found to exist actually prejudiced that party's substantial rights. Kahler urges us to apply the constitutional harmless error test set out in *Ward*, 292

Kan. 541 (constitutional error may be declared harmless where party benefiting from error proves beyond a reasonable doubt that error complained of did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict). But having found only one instance of misconduct that was not reversible standing alone, the cumulative error rule is inapplicable here.

In the process of reviewing the judicial misconduct claims, we noted some instances in which the district judge could have applied a better practice to the situation at hand. Nonetheless, we discern no pattern of conduct that manifested bias, prejudice, or partiality against the defendant, and Kahler's claim of judicial misconduct fails.

### III. EXPERT WITNESS INSTRUCTION

Prior to trial, Kahler requested that the district court give the jury an instruction on how it may consider the opinion testimony of experts. The State objected and the district court declined to give the proffered instruction because expert opinion instructions are not recommended by the criminal Pattern Instructions for Kansas (PIK). See PIK Crim. 3d 52.14 (1995 Supp.), Comment ("The Committee believes that an expert should be considered as any other witness as set forth in PIK [Crim.] 3d 52.09, Credibility of Witnesses."). Kahler claims that the district court's ruling was erroneous.

*Standard of Review*

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to

30

the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Analysis*

The requested instruction, based on the Tenth Circuit Court of Appeals Pattern Criminal Jury Instruction 1.17, reads as follows:

"During the trial you heard the testimony of _____ who expressed opinions concerning _____. In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

"You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial."

Although the State objected to the instruction at trial, it concedes on appeal that the instruction accurately states the law. The PIK Committee, however, continues to recommend that a separate instruction on expert opinion testimony not be given. See PIK Crim. 4th 51.170 (2013 Supp.).

The district judge did give the standard instruction on witness testimony, which states: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the

matter about which a witness has testified." PIK Crim. 3d 52.09 (1996 Supp.). Neither party objected to this instruction. The State contends that this instruction adequately covers the substance of the requested instruction.

This court has frequently emphasized the wisdom of following the PIK Committee recommendations. See *State v. Cox*, 297 Kan. 648, 662, 304 P.3d 327 (2013); *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). On the other hand, we have also said that the failure to use the exact language of a PIK instruction is not fatal. *State v. Bernhardt*, 304 Kan. 460, 470, 372 P.3d 1161 (2016). Moreover, a district court should not hesitate to modify or add to pattern instructions where appropriate in a particular case. 304 Kan. 460, Syl. ¶ 1.

In *State v. Willis*, 240 Kan. 580, 587, 731 P.2d 287 (1987), this court considered the giving of an expanded instruction on witness credibility. The *Willis* court concluded there was no clear error in the giving of the expanded instruction but noted "it would certainly have been the better practice to give an instruction along the lines of PIK Crim. 2d 52.09." 240 Kan. at 587. The expert witness instruction requested here, although contained in a separate instruction, was, in effect, an expanded version of the witness credibility instruction.

Then, in *State v. Hunt*, 257 Kan. 388, 395, 894 P.2d 178 (1995), this court stated that it "has continually disapproved the giving of an expanded version of the credibility instruction," although it had also continually held that to do so was not clearly erroneous. Later, in *State v. Adams*, 292 Kan. 151, 159, 254 P.3d 515 (2011), the district judge provided a witness credibility instruction based on PIK Crim. 3d 52.09 that also included wording from a civil pattern jury instruction regarding expert witnesses. See PIK Civ. 4th 102.50. The added language, like the language in the federal instruction Kahler requested, instructed the jury that testimony of experts was to be considered like any other testimony

and should receive the same weight and credit as the jury deemed it entitled to when viewed in connection with all the other facts and circumstances. The defendant alleged the instruction was erroneous because the district court did not follow the PIK Committee's recommendation not to give an expert witness instruction in criminal trials. The *Adams* court observed:

"The instruction accurately stated the law as it stands in Kansas. The jury should weigh expert witness testimony in the same manner it weighs all testimony. . . .

"In addition, Adams' jury would not reasonably have been misled by the instruction. Had the first paragraph of the hybrid stood alone, the jury still would have been instructed as to how to assess credibility of all witnesses, regardless of expertise." 292 Kan. at 166.

But this case highlights that there is a fundamental difference between an ordinary witness' testimony as to the facts of a case and an expert's opinion testimony as to what those facts mean. Indeed, opinion evidence from experts is admissible precisely because the jurors' common knowledge and experience would not permit them to properly understand the circumstances of the case. "Where the normal experience and qualifications of jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are not necessary." *Sterba v. Jay*, 249 Kan. 270, Syl. ¶ 6, 816 P.2d 379 (1991). Yet, the general instruction in PIK Crim. 3d 52.09 recites, in part: "You have the right to use common knowledge and experience in regard to the matter about which a witness has testified." If a witness has been permitted to give an expert opinion because the subject matter is beyond the common knowledge and experience of the jurors, how does a juror use his or her nonexistent common knowledge and experience to assess the expert's testimony?

33

Moreover, an expert witness is permitted to share his or her opinion with the jury only after the trial judge has reached the legal conclusion that the witness is, indeed, an expert on the topic about which he or she is going to opine. The regular witness credibility instruction does not clarify for the jurors that they may reject the expert opinion even though it has been stamped with the judge's imprimatur. In short, there is nothing generic about opinion testimony from expert witnesses, and the jury's assessment of the credibility of that testimony should not be left to the insufficient direction contained in the generic PIK instruction.

Consequently, the district court erred when it refused to give the defense's requested instruction on expert witness credibility because the instruction was legally appropriate and factually supported. But that does not end the discussion; the error is subject to a harmlessness analysis. In that regard, notwithstanding that the legal substance of the requested instruction was not adequately covered by the general instructions that were given, there is no reasonable possibility that the error affected the jury's guilty verdict. In other words, the error was harmless.

IV. CONSTITUTIONALITY OF K.S.A. 22-3220

For his fourth issue, Kahler contests the constitutionality of K.S.A. 22-3220. The statute provides:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense."

At trial, Kahler based his defense on mental disease or defect. He filed a motion alleging that the statute unconstitutionally deprived him of the ability to assert a defense

based on insanity. The district court denied the motion, and the jury was instructed in accord with the statute. On appeal, Kahler continues to assert his constitutional challenge.

*Standard of Review*

Whether a statute is constitutional raises a question of law over which this court exercises unlimited review. *State v. Reed*, 306 Kan. 899, 903-04, 399 P.3d 865 (2017).

*Analysis*

Before the enactment of K.S.A. 22-3220, the *M'Naghten* rule was the proper test for the defense of insanity in Kansas. See *State v. Lamb*, 209 Kan. 453, 472, 497 P.2d 275 (1972); *State v. Nixon*, 32 Kan. 205, Syl. ¶ 1, 4 P. 159 (1884) (adopting rule). The *M'Naghten* rule provided that

> "the defendant is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or, in the alternative, (2) where he does not know right from wrong with respect to that act. Under the 'right and wrong' test of criminal insanity, it must be proved that at the material time the accused did not know that what he was doing was contrary to law." *State v. Baker*, 249 Kan. 431, 450, 819 P.2d 1173 (1991).

But the Kansas legislature abandoned the *M'Naghten* rule through enactment of K.S.A. 22-3220, which became effective January 1, 1996. The statute adopted what is known as the "mens rea approach." The mens rea approach allows evidence of mental disease or defect as it bears on the mental element of a crime but abandons lack of ability to know right from wrong as a defense. See *State v. Jorrick*, 269 Kan. 72, 81-83, 4 P.3d 610 (2000). Kahler argues that by doing so the statute violates the Due Process Clause because it offends a principle of justice so rooted in the traditions and conscience of our

35

people as to be ranked as fundamental. See *Patterson v. New York,* 432 U.S. 197, 201-02, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977).

The same arguments made by Kahler were considered and rejected by this court in *State v. Bethel,* 275 Kan. 456, 66 P.3d 840 (2003). The *Bethel* court conducted a thorough review of the pertinent decisions of the United States Supreme Court and other states that had considered the issue. Ultimately, the *Bethel* court concluded that "K.S.A. 22-3220 does not violate the defendant's right to due process under the United States or Kansas Constitutions." 275 Kan. at 473; see *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990) (finding mens rea approach of state statute did not violate due process); *State v. Korell*, 213 Mont. 316, 690 P.2d 992 (1984) (same); *State v. Herrera*, 895 P.2d 359 (Utah 1995) (same). Kahler relies on *Finger v. State*, 117 Nev. 548, 569, 27 P.3d 66 (2001), in which the Nevada Supreme Court held legal insanity is a fundamental principle of the criminal law of this country. But the *Bethel* court considered and rejected the reasoning of the Nevada Supreme Court in *Finger*, and we adhere to our *Bethel* decision.

Although Kahler has added no new arguments to those this court considered and rejected in *Bethel*, he directs our attention to a written dissent from a denial of certiorari by three justices in *Delling v. Idaho*, 568 U.S. 1038, 133 S. Ct. 504, 184 L. Ed. 2d 480 (2012) (Breyer, J., dissenting, joined by Ginsburg and Sotomayor, JJ.). The dissent was critical of the mens rea approach because it allows conviction of an individual who had no capacity to know that what he or she was doing was wrong. The dissent would have granted the petition for certiorari to consider whether Idaho's modification of the insanity defense is consistent with the Fourteenth Amendment's Due Process Clause. 568 U.S. at 1041 (Breyer, J., dissenting). As part of its discussion, the dissent cited *Bethel* and noted that Kansas is one of only four states that have adopted the mens rea approach. While we are cognizant of the three justices' position, the *Delling* dissent has no effect on our *Bethel* decision.

36

The parties have thoroughly set out the arguments and cases in their briefs. Nonetheless, Kahler has offered no new reason to reconsider the arguments previously and thoughtfully rejected by this court. Thus a review of those arguments or of *Bethel* is not warranted.

## V. LESSER INCLUDED OFFENSE INSTRUCTION ON FELONY MURDER

Kahler did not request an instruction that would have permitted the jury to convict him of felony murder, as a lesser included offense of capital murder. He claims on appeal that it was clearly erroneous for the district court to fail to give that lesser included offense instruction on its own.

*Standard of Review*

To determine whether the district court's failure to sua sponte give an unrequested jury instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. "To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012).

*Analysis*

Kahler's brief was filed after this court's decision in *State v. Cheever*, 295 Kan. 229, 259, 284 P.3d 1007 (2012), *vacated and remanded on other grounds* 571 U.S. ____, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013), held that felony murder was a lesser included offense of capital murder and, consequently, that an instruction to that effect should be

given in a capital case where warranted by the evidence. Although no felony murder instruction was requested or given in Kahler's case, he argued in his opening brief, pursuant to *Cheever*, that one was warranted and that it was clear error not to give it.

By the time the State filed its responsive brief, the legislature had amended K.S.A. 2012 Supp. 21-5402, in response to *Cheever*, to specifically provide that felony murder was not a lesser included offense of capital murder. See L. 2013, ch. 96, § 2; K.S.A. 2016 Supp. 21-5402(d). While the State raised a number of arguments, it primarily argued that K.S.A. 2016 Supp. 21-5402(d) applied retroactively by its specific terms to overcome Kahler's argument. Anticipating Kahler's reply, the State also argued that K.S.A. 2016 Supp. 21-5402(d) was neither unconstitutional under the Ex Post Facto Clause of the United States Constitution nor precluded by due process under *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

As anticipated, Kahler's reply brief focused on arguments against the constitutionality of K.S.A. 2016 Supp. 21-5402(d) based on *Beck* and the Ex Post Facto Clause. Two months after the reply brief was filed, this court considered and decided the same arguments in *State v. Gleason*, 299 Kan. 1127, 1160-61, 329 P.3d 1102 (2014), *rev'd and remanded on other grounds sub nom. Kansas v. Carr*, 577 U.S. ____, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

*Gleason* concluded:

"K.S.A. 2013 Supp. 21-5402(d), by its express language, applies retroactively, foreclosing Gleason's claim that the district court erred in refusing Gleason's request for a felony-murder instruction. Further, the 2013 amendments do not violate Gleason's constitutional right to due process, as interpreted in *Beck,* nor does retroactive application violate the prohibition against ex post facto laws." 299 Kan. at 1160-61.

In *State v. Carr*, 300 Kan. 1, Syl. ¶ 31, 331 P.3d 544 (2014), *rev'd and remanded* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016), this court held the ruling in *Gleason* eliminated any need to address the argument that a lesser included offense instruction for felony murder was supported by the evidence admitted at trial. And, subsequently in *Cheever*, 306 Kan. at 770, again considering the same arguments, this court held "[t]he reasoning of the *Gleason* and *Carr* cases applies with equal force and effect to this case and requires us to conclude that Cheever was not entitled to a felony-murder lesser included offense instruction. The trial judge did not err when he did not give one."

*Gleason* controls this case and dictates the conclusion that the district judge did not err by failing to give a felony-murder lesser included offense instruction because such an instruction was not legally appropriate.

## VI. LIMITATIONS ON DEFENSE VOIR DIRE

Kahler alleges the district court denied him a fair trial by prohibiting his counsel from questioning prospective jurors during voir dire about their views on the death penalty.

*Standard of Review/Analytical Framework*

The purpose of voir dire is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. The nature and scope of voir dire examination is entrusted to the sound discretion of the trial court; however, appellate tribunals have the duty to make an independent evaluation of the circumstances of voir dire in determining whether the district court has taken sufficient measures to ensure the accused is tried by an impartial jury free from outside influences. *State v. Reyna*, 290 Kan. 666, 686, 234

39

P.3d 761 (2010); *Hayden*, 281 Kan. at 128-29; *Aikins*, 261 Kan. at 365-66. An adequate voir dire is essential to protect a defendant's right to an impartial jury guaranteed by the Fifth and Sixth Amendments to the United States Constitution. *State v. Robinson*, 303 Kan. 11, 135, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

We will find an abuse of discretion if the trial court has unconstitutionally restricted a capital defendant's questioning during voir dire. 303 Kan. at 135-36. Mindful that this is a capital case in which the jury has imposed the death penalty, we have carefully examined the record of the district court's conduct of voir dire. Simply put, we find no support for Kahler's argument in the record.

The district judge consistently took the position that Kahler's counsel could not question prospective jurors about their views on the death penalty in the presence of other venire members. Clearly, the district judge was concerned that an individual panel member's comments could prejudice other members and wished to avoid a situation in which it might become necessary to disqualify an entire panel. But discussions between counsel and the district judge prior to commencement of trial, along with the written order covering the conduct of voir dire, made clear that counsel were entitled to question venire members individually when their in-court answers indicated a need to delve into matters outside the hearing of the rest of the panel. At oral argument, counsel for Kahler acknowledged that Kahler's trial counsel was not prevented from making an individual inquiry of each venire person's death penalty views. In fact, trial counsel never made a request to question any of the venire members individually. Consequently, while an absolute prohibition against inquiry in front of the rest of the venire panel might be an unnecessary precaution against the risk of tainting the entire panel, it was not error here.

## VII. CUMULATIVE ERROR DURING THE GUILT PHASE

Kahler claims that his guilt phase convictions must be reversed because cumulative trial errors denied him a fair trial.

*Standard of Review/Analytical Framework*

"'Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.'" *Kleypas*, 305 Kan. at 345. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *Dixon*, 289 Kan. at 71.

"For errors to have a cumulative effect that transcends the effect of the individual errors, there must have been more than one individual error. [Citation omitted]." *State v. Cruz*, 297 Kan. 1048, 1074, 307 P.3d 199 (2013). We have agreed with Kahler that the trial judge should not have told the jury, "I normally don't do this," before giving PIK Crim. 4th 50.070 after opening statements and that the trial judge erred in refusing to give the expert witness instruction requested by the defense. In the process of our review, we also noted an erroneous ruling by the district court on an objection the State lodged during defense counsel's closing argument. In short, there was more than one trial error.

But the touchstone is whether the defendant received a fair trial, not whether he received a perfect trial. See *Cruz*, 297 Kan. at 1075 (defendant entitled to fair trial, not a perfect one). Moreover, we have declined to find reversible error under the cumulative error rule where "'the evidence is overwhelming against the defendant.'" 297 Kan. at 1074. On the record before us, we are firmly convinced beyond a reasonable doubt that the guilty verdict would not have changed if the errors had not been committed.

We also note that the errors identified during the guilt-phase proceeding are not the type that we would expect to impact the sentencing determination when the same jury decides both guilt and sentence. See *Cheever*, 306 Kan. at 800. Accordingly, we do not revisit this error in our penalty-phase discussion.

VIII. EIGHTH AMENDMENT CATEGORICAL CHALLENGE TO DEATH PENALTY

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." Kahler claims that a sentence of death violates that constitutional right when it is imposed upon a severely mentally ill person.

Although Kahler relies on a motion he filed in the district court as having raised this issue below, that motion did not set out a categorical proportionality argument based on mental illness. Nevertheless, this court has held that a categorical proportionality challenge under the Eighth Amendment may be raised for the first time on appeal. *State v. Ruggles*, 297 Kan. 675, 679, 304 P.3d 338 (2013) (analysis does not require review of district court factual findings; claim presents question of law determinative of case).

*Standard of Review/Types of Categorical Challenges*

"A categorical proportionality challenge under the Eighth Amendment implicates questions of law, and this court has unlimited review." *State v. Dull*, 302 Kan. 32, 40, 351 P.3d 641 (2015).

"The United States Supreme Court identifies three subcategories of categorical proportionality challenges. The first considers the nature of the offense, such as a prohibition on capital punishment for nonhomicide crimes against individuals. *Graham*, 560 U.S. at 60-61 (citing *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 [1982]). The second considers the characteristics of the offender, such as a

42

categorical rule prohibiting the death penalty for juveniles. *Graham*, 560 U.S. at 61 (citing *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005]). The third, which was first recognized in *Graham*, combines the two because it 'implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes.' 560 U.S. at 61." *State v. Williams*, 298 Kan. 1075, 1086, 319 P.3d 528 (2014).

*Analysis*

Kahler's claim fits within the second subcategory of offender characteristics. He proposes a categorical rule prohibiting the death penalty for offenders who were severely mentally ill at the time of their crimes.

In analyzing claims under this second category, the United States Supreme Court employs a two-part test:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. *Roper*, [543 U.S.] at 563. Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' *Kennedy,* 554 U.S., at 421, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. *Roper*, [543 U.S.] at 564." *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010).

See *Williams*, 298 Kan. at 1087 (identifying two-factor test for analyzing categorical proportionality challenge).

We recently considered and rejected a nearly identical argument in *Kleypas*, 305 Kan. at 328-37. In fact, Kahler's brief is, with the exception of those portions pertaining directly to Kahler himself, nearly word for word the same brief that was submitted on this issue in *Kleypas*.

In *Kleypas*, we said that the defendant had not shown the kind of legislative consensus that the Supreme Court relies upon in the first part of its test. Then, in exercising our independent judgment under the second part of the test, we opined as follows:

> "As to the second-prong of the test, we explained in *Williams* that 'community consensus is entitled to great weight but it is not determinative.' 298 Kan. at 1087. And in *State v. Mossman*, 294 Kan. 901, 281 P.3d 153 (2012), we observed:

>> "'In accordance with the constitutional design, "the task of interpreting the Eighth Amendment remains [the Court's] responsibility." [Citation omitted.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. [Citations omitted.] In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. [Citations omitted.]' *Mossman,* 294 Kan. at 929 (quoting *Graham,* 560 U.S. at 67-68).

> "*Atkins* and *Roper* both identify retribution and deterrence as the 'legitimate penological goals' served by the imposition of the death penalty on those who commit the worst crimes. See *Roper*, 543 U.S. at 571; *Atkins*, 536 U.S. at 319. Both conclude that the characteristics of juveniles and the mentally retarded, respectively, make offenders in those categories less culpable than the 'average murderer.' *Atkins*, 536 U.S. at 319. And being less culpable and less amenable to deterrence, the death penalty is inappropriate for their crimes.

"In support of his argument, Kleypas simply states '[t]he culpability of the severely mentally ill is diminished in the same manner as juveniles and the mentally retarded.' He cites language quoted from the ABA recommendation report to illustrate that some severe disorders result in hallucinations or delusions. But the ABA report itself recognizes that diagnosis alone is not a sensible basis for the exemption and, consequently, a case-by-case determination will be required. The report recognizes that *Atkins* left the definition of 'mental retardation' to the states. See 536 U.S. at 317. The report continues:

> "'*Atkins* held the death penalty excessive for *every* person with mental retardation, and the Supreme Court therefore dispensed with a case-by-case assessment of responsibility. However, for the disorders covered by this . . . part of the Recommendation, preclusion of a death sentence based on diagnosis alone would not be sensible, because the symptoms of these disorders are much more variable than those associated with retardation or the other disabilities covered by the Recommendation's first paragraph.' ABA Recommendation Number 122A at 671.

"In contrast, in *Roper*, the United States Supreme Court noted that '[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability.' 543 U.S. at 572-73. And in *Atkins*, the Court noted that clinical definitions of mental retardation shared common features which ultimately bore on the determination of culpability. See 536 U.S. at 317-18.

"Mental illnesses present less discernable common characteristics than age or mental retardation. Caselaw relating to the implementation of *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986), and *Panetti v. Quarterman,* 551 U.S. 930, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007), illustrates the difficulty in defining a discernable standard relating to mental illness. See *Panetti v. Quarterman*, 2008 WL 2338498 (W.D. Tex. 2008). As the ABA standard recognizes, case-by-case evaluations would be necessary; it follows that the level of culpability will vary on a case-by-case

45

basis. While we recognize that some mental illnesses may make a defendant less culpable and less likely to be deterred by the death penalty, often such illnesses can be treated and may not manifest in criminal behavior.

"We also note the protections already in place, which protect the incompetent from trial and the 'insane' from execution. See K.S.A. 2015 Supp. 22-3302 (competency); *Ford,* 477 U.S. at 410 (Eighth Amendment prohibits executing those who are 'insane' at the time the sentence is carried out). In addition, a defendant may present a defense to the crimes based on a lack of capacity. K.S.A. 2015 Supp. 21-5209. Finally, as Kleypas did here, mental illness can be asserted as a mitigator. While we recognize a distinction between disqualification and mitigation, we also recognize that presenting mental illness as a mitigator allows the jury to consider culpability.

"Given these variables and considerations, in the exercise of our independent judgment, we reject a categorical prohibition based on the broad classification of mental illness, even as defined by the ABA standard, in favor of individualized assessments through the sentencing proceeding. See *Graham*, 560 U.S. at 58-61. We have confidence that Kansas juries can weigh a defendant's mental state at the time of the crime as a mitigating factor for consideration in the decision of whether to return a death penalty verdict.

"We conclude that Kleypas fails to make the showing necessary under either prong of the two-part categorical proportionality analysis. We, therefore, deny his Eighth Amendment categorical proportionality challenge and conclude the Eighth Amendment does not categorically prohibit the execution of offenders who are severely mentally ill at the time of their crimes." 305 Kan. at 335-37.

We find this issue controlled by our decision in *Kleypas* and see no reason to revisit that holding.

## IX. CONSTITUTIONALITY OF THE AGGRAVATING CIRCUMSTANCES

Kahler argues the two aggravating circumstances relied upon by the State to justify the death penalty failed to properly channel the jury's discretion as required by the federal and state constitutions. He argues that the "killing or creating a great risk of death to more than one person" factor is duplicative of the elements needed to prove capital murder. He argues that the "heinous, atrocious, and cruel" factor is vague and duplicative.

*Standard of Review*

The constitutionality of a statutory aggravating circumstance is a question of law subject to unlimited review. *Gleason*, 299 Kan. at 1186 (because challenge to constitutional validity of aggravating circumstances may require statutory interpretation, review is unlimited).

*Analysis*

Kahler acknowledges in his brief that this court has decided the questions raised in this issue against him. See *State v. Scott*, 286 Kan. 54, 110, 183 P.3d 801 (2008) (using the same conduct as element of capital murder and as aggravating factor not unconstitutional), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Kleypas*, 272 Kan. 894, 1029, 40 P.3d 139 (2001) ("heinous, atrocious or cruel" aggravating circumstance, as defined and narrowed in sentencing jury instructions, narrows class of persons who are death eligible in constitutional manner), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Kahler has raised no new arguments nor pointed to any caselaw which would provide a basis for reconsideration of those decisions, and we decline to do so.

## X. SUFFICIENCY OF THE EVIDENCE OF AN AGGRAVATING CIRCUMSTANCE

For his final issue, Kahler argues there was insufficient evidence to support the jury's finding of the second aggravating factor argued by the State, *i.e.*, that the crime was committed in an especially heinous, atrocious, or cruel manner.

*Standard of Review*

The standard of review of the sufficiency of the evidence to support an aggravating circumstance was set out by this court in *Kleypas*, 272 Kan. at 1019, to-wit:

> "The standard of review on appeal as to the sufficiency of evidence regarding an aggravating circumstance is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt."

*Analysis*

At the penalty hearing, the State relied in part on the evidence it had presented at the guilt phase trial. The State also put the coroner, Dr. Erik Mitchell, back on the stand to largely repeat his testimony from the guilt phase concerning the bullet wounds suffered by each of the victims. With respect to each victim, Mitchell described where each bullet entered the body, how the wound or wounds would have affected the victim's awareness and her ability to feel pain, and, ultimately, how they would have brought about her death. He testified that all of the women would have suffered the severe pain of being shot. He also concluded that all of them retained awareness long enough to know of the other shootings going on around them and to be cognizant of their own possible impending death.

48

The jury was instructed in accord with PIK Crim. 3d 56.00-C6 (2008 Supp.), on the heinous, atrocious, or cruel aggravating circumstance:

"That the defendant committed the crime of capital murder in an especially heinous, atrocious or cruel manner. As used in this instruction, the following definitions apply:
- 'heinous' means extremely wicked or shockingly evil;
- 'atrocious' means outrageously wicked and vile; and
- 'cruel' means pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others.

"In order to find that the crime of capital murder is committed in an especially heinous, atrocious, or cruel manner, the jury must find that the perpetrator inflicted serious mental anguish or serious physical abuse before the victim['s] death. Mental anguish includes a victim's uncertainty as to her ultimate fate."

We have often held that shooting deaths are not inherently heinous, atrocious, or cruel. We compiled a number of those cases in *State v. Baker*, 281 Kan. 997, 1019, 135 P.3d 1098 (2006). See, e.g., *State v. Holmes*, 278 Kan. 603, 608, 638-39, 102 P.3d 406 (2004) (reversing hard 40 sentence because firing a single shot through the victim's heart was not especially heinous, atrocious, or cruel); *State v. Flournoy*, 272 Kan. 784, 794, 36 P.3d 273 (2001) (holding that the defendant's act of shooting the victim five times within 1 minute was not especially heinous, atrocious, or cruel); *State v. Cook*, 259 Kan. 370, 401-03, 913 P.2d 97 (1996) (reversing hard 40 sentence because the defendant's act of shooting the victim twice was not especially heinous, atrocious, or cruel); *State v. Reed*, 256 Kan. 547, 562-63, 886 P.2d 854 (1994) (concluding that shooting the victim in the head was not especially heinous, atrocious, or cruel and other testimony supporting the finding amounted to conjecture and speculation).

49

In *Baker*, we also reviewed a number of cases in which this court had found shooting deaths to be especially heinous, atrocious, or cruel. 281 Kan. at 1019-20. See, e.g., *State v. Washington*, 280 Kan. 565, 571-72, 123 P.3d 1265 (2005) (shooting deaths were especially heinous, atrocious, or cruel when the victims attempted to flee after being shot and the defendants pursued the victims, continuing to shoot until the victims died); *State v. Perry*, 266 Kan. 224, 234, 968 P.2d 674 (1998) (defendant waved gun in front of his victims before shooting them and forced one of the victims to watch the defendant shoot her sister); *State v. Brady*, 261 Kan. 109, 123-24, 929 P.2d 132 (1996) (defendant forced two shooting victims to lie face down on floor with their heads close together while he paced around room for about 15 minutes holding a gun, then shot first victim in the head while second victim watched, then shot second victim in the head). We concluded in *Baker* that the "common thread" running between those cases in which we held a shooting death had been especially heinous, atrocious, or cruel was evidence of the infliction of mental anguish upon the victim prior to death. 281 Kan. at 1020.

A more recent case is factually similar to this case. In *State v. Hayes*, 299 Kan. 861, 327 P.3d 414 (2014), defendant Terry Ray Hayes was married to Tiffani Hayes for a little over a year. In April 2010, Tiffani moved out, and shortly afterward, Hayes filed for a divorce. He experienced depression and suicidal ideations following the breakup. There was evidence that Hayes continually contacted Tiffani electronically, at work and elsewhere, that he accused her of infidelity, and that he had told others he would kill her. On the day of the murder, Hayes lured Tiffani to his home by telling her he had some of her property that she needed to pick up. Tiffani arrived with a friend and approached Hayes who was in the driveway. The friend witnessed Hayes confront Tiffani, heard Tiffani scream, and then saw Tiffani being chased down as she tried to escape from Hayes who had a gun. Hayes shot Tiffani in the back of the head when he caught up to her. In summing up the evidence supporting the aggravator, this court said there was "evidence that Hayes had threatened Tiffani in the past, that he lured her to his residence

in order to kill her, and that he killed Tiffani as she tried to run away from him." 299 Kan. at 868.

Here, there was evidence that Kahler engaged in similar electronic stalking in which he sent emails to Karen, to Karen's lover, and to others. There was evidence Kahler was severely depressed and was obsessed with Karen's leaving. There was also evidence of a prior physical threat to Karen. Karen had previously had Kahler arrested for battering her, and she was aware of his obsessive behavior. In *Hayes*, the district court relied on similar evidence to establish that Tiffani had reason to fear Hayes and, as a result, suffered mental anguish at the time of her death. As in *Hayes*, it is reasonable to conclude that Kahler's prior behavior contributed to Karen's mental anguish when he walked into Wight's kitchen with a gun and shot her.

In addition to the evidence above, there is clear evidence from the Life Alert recording that Kahler methodically went through the house shooting each of the women in turn. The coroner's testimony established that the bullet wounds to each of the victims were not immediately fatal and would have left each victim conscious long enough to suffer the physical pain of her injuries in addition to the mental anguish of her impending death. The evidence clearly established that Wight and Lauren were aware of others being shot before them and lived long enough to suffer seriously from their own wounds and to fear for their own lives. The Life Alert recording established beyond question that Lauren suffered severe mental anguish as her father went through the house shooting her family members as she lay mortally wounded fearing for her own life. Viewing this evidence in the light most favorable to the prosecution, we easily conclude that a rational factfinder could have found beyond a reasonable doubt that Kahler committed the murders in an especially heinous, atrocious, or cruel manner.

We applied the same standard of review in *Gleason*, where we recognized our "independent duty to consider the sufficiency of the evidence to support the jury's findings on aggravating circumstances." 299 Kan. at 1189 (citing K.S.A. 2013 Supp. 21-6619[c][2], which provides this court "shall determine . . . whether the evidence supports the findings that an aggravating circumstance or circumstances existed").

Kahler does not contest the jury's finding that Kahler killed or created a great risk of death to more than one person. But under our independent duty to determine "whether the evidence supports the findings that an aggravating circumstance or circumstances existed," see K.S.A. 2016 Supp. 21-6619(c)(2), we have no problem determining that the evidence was sufficient to support this aggravating circumstance. With our determination above that sufficient evidence supported the heinous, atrocious, or cruel aggravating circumstance, we now must determine whether the evidence supports the finding that "mitigating circumstances were insufficient to outweigh the aggravating circumstances." K.S.A. 2016 Supp. 21-6619(c)(2). Again, we have no difficulty in determining that the jury's weighing determination and sentencing verdict were supported by the evidence.

CONCLUSION

Kahler's conviction of capital murder under K.S.A. 21-3439(a)(6) and his sentence of death are affirmed.

ROSEN, J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 106,981 vice Justice Rosen under the authority vested in the Supreme Court by K.S.A. 20-2616.

BILES, J., concurring in part and dissenting in part: I agree with the majority's decision to affirm James K. Kahler's convictions and sentences but disagree with one conclusion reached by the majority. I would not characterize as misconduct the trial judge's aside that "I normally don't do this" before giving the pattern jury instruction about remarks of counsel. I think the majority reaches the wrong conclusion and in the process does a disservice to the trial bench. It slaps a "judicial misconduct" label on what, at worst, should be an opportunity for a simple "teaching moment" to caution judges about their banter with juries.

The comment in question came after defense counsel's opening statement. Recall there were three objections to defense counsel's opening statement with one admonition to defense counsel being overheard by the jury. And after counsel finished, the district judge gave an admittedly proper preliminary jury instruction, saying:

> "All right. Ladies and gentlemen of the jury, I'm going to read an instruction to you at this time. *I normally don't do this, but I am going to ask that you listen carefully*. This is one of the instructions that will be given to you later but I wish to give it to you now also. That statement is: Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." (Emphasis added.)

Kahler argues this passing comment about what normally occurs in a typical trial, along with its proximity to his counsel's opening statement and the State's objections, shows judicial bias requiring reversal of Kahler's convictions. The majority does not go that far, but it tags the comment as judicial misconduct. I disagree.

53

When addressing the merits of this alleged judicial misconduct—"I normally don't do this"—this court must consider the facts and circumstances surrounding the alleged misconduct to decide whether the remark manifested bias that impaired the trial's fairness. *State v. Hayden*, 281 Kan. 112, 116, 130 P.3d 24 (2006). In this case, the trial judge had a tough job. He was coping with a particularly heinous, high-profile death penalty case involving a quadruple homicide. Two victims were young girls.

In what was obviously an effort to maintain focus and order, the trial judge sandwiched both counsel's opening statements between appropriate preliminary pattern jury instructions. Immediately before the State's opening remarks, the trial judge instructed jurors to consider only the testimony and exhibits admitted into evidence. Immediately after the defense's remarks, the trial judge cautioned the jury as recited above.

It is impossible for me to understand how the defense can cry foul when what the trial judge advised the jury about included a comment that explained the State and defense counsel's purpose in giving their openings was to help jurors understand the evidence and application of the law. Surely, no one would take the State seriously if it objected that its opening statement was diminished because it was preceded by the judge telling the jury to consider only the testimony and exhibits—effectively inviting the jury to disregard what it was about to hear. And the instruction that followed the opening statements here can objectively be seen as validating the purpose of opening statements, rather than degrading a particular speaker's integrity.

What we are left with is the trial judge's aside that he "normally" did not give the later instruction, but wanted the jury to hear it then, and would give it again later. What would a reasonable person take from this?

Indulging the majority's willingness to speculate, one obvious answer arises because these jurors knew they were hearing an abnormal, highly charged, multiple murder case in which an individual's life hung in the balance. And given that, they would have far more readily associated the judge's comment that he did not "normally" give a particular instruction with the serious business at hand and what was most assuredly on everyone's minds, i.e., the grisly case being heard. Instead, the majority steadfastly conjectures that jurors "would" see the remarks "undoubtedly" as targeting the defense in some critical way. Slip op. at 20-21. That conclusion is too farfetched under the facts and circumstances presented.

I disagree with the majority's characterization of this remark as judicial misconduct and error. But I agree if the comment was error, it was harmless beyond a reasonable doubt.

STEGALL, J., joins the foregoing concurring and dissenting opinion.

* * *

JOHNSON, J., dissenting:  I dissent. To effect synergy with the majority, I will address each of its issues in turn, including those with which I agree, followed by the unassigned error of unconstitutionally inflicting the cruel and/or unusual punishment of death.

ISSUE #1:  PROSECUTORIAL ERROR

I agree with the majority's holding that it is within the prosecutor's permissible latitude to object on the ground that the defense's closing argument is about to go beyond the admitted evidence, even where the objection is based on the prosecutor's erroneous

55

understanding of the law. I disagree, however, with the majority's suggestion that bad faith or ill will can never play any role in the error analysis. I would submit that a prosecutor does *not* have the wide latitude to intentionally seek to lure the trial court into erroneously excluding permissible defense arguments. Such bad faith conduct, manifesting ill will, does, indeed, constitute prosecutorial error. But I do not discern that the prosecutor in this case crossed that line.

ISSUE #2:  JUDICIAL MISCONDUCT

I agree with the majority on its assessment of the judge's remarks to the third panel of venire persons warning against blurting out personal opinions. Although a more articulate admonition would have included the clarification that panel members could individually advise the court of their respective personal concerns about the death penalty outside the presence of the others that omission in this context did not rise to the level of misconduct.

Likewise, I agree with the majority that it would have been better if the venire panel had not heard the trial judge ask the defense to pick up the pace. See *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010) ("[A] trial judge should be cognizant that jurors afford the presiding judge a great deal of respect and '"can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word."' [Citation omitted.]"). But I discern no judicial misconduct.

Further, I agree with the majority's finding of error regarding the third alleged incident of judicial misconduct during which the district judge told the jury that he normally did not give the instruction on counsel's statements not being evidence after the opening statements. The majority correctly discerns that, in context, the judge's comment

brought special attention to the instruction and the jury could have concluded that the extra instruction was specifically aimed at the credibility of the defense opening statement.

With respect to the judge's questioning of the deputy, I would concur with the majority's determination that, although the better practice would have been for the district judge to ask the prosecutor to seek clarification of the testimony, there was no misconduct here. The judge's questions did not suggest partiality toward the State. Indeed, the questioning could be viewed as having cast some doubt on the deputy's thoroughness or expertise.

The alleged judicial misconduct set forth in II.E. is a corollary to the alleged prosecutorial error in the first issue. To reiterate, after the prosecutor objected to defense counsel's stating what the male voice was saying on the Life Alert tape, the district judge ruled: "I think it's improper. You cannot say what you think is on the tape." Kahler contends that it was misconduct for the judge to sustain the objection and it was also misconduct for the judge to state in front of the jury that the defense argument was improper.

I agree with the majority's assessment that the district court's ruling on the State's objection during the defense closing argument was legally infirm and constituted an unassigned trial error. But, as the majority correctly states, Kahler had to show more than an erroneous ruling on an objection to establish his assigned error of judicial misconduct. He did not do so here, even with the judge's use of the word "improper" to describe the legal status of the argument.

Kahler's complaint about the judge's remarks concerning jury questions during deliberations is similarly miscast as judicial misconduct. Even if the judge's comments

were erroneous, Kahler does not explain how discouraging jury questions would inevitably result in bias, prejudice, or partiality that was adverse to the defense. One can imagine that a jury could have some questions which, if left unresolved, would prejudice the State. Consequently, although I view the judge's remarks to be ill-advised and erroneous, especially in a death penalty case, I cannot say they rise to the level of being misconduct.

In sum, I concur with the majority that the record does not support the defendant's claim that the district judge engaged in a pattern of conduct that manifested bias, prejudice, or partiality against the defense. But defendant's arguments on this issue point out two unassigned errors, i.e., the district court erroneously sustained the State's objection during the defense closing argument, and the district court erroneously discouraged the jury from exercising its right, after retiring for deliberations, "to be informed as to any part of the law or evidence arising in the case." K.S.A. 22-3420(3).

Individually, the judge's erroneous instruction following defense counsel's opening statement and the two unidentified errors would not have changed the jury's guilty verdict. I discuss their cumulative prejudicial effect in Issue #7.

ISSUE #3:  REQUESTED INSTRUCTION ON EXPERT WITNESSES

I agree with the majority that the district court erred in refusing to give the requested instruction on expert witness credibility, but that the error standing alone did not affect the jury's guilt-phase verdict.

ISSUE #4: CONSTITUTIONALITY OF K.S.A. 22-3220

In rejecting Kahler's constitutional challenge to this state's elimination of the insanity defense, in favor of a mens rea approach, the majority leans heavily on its assessment that Kahler adds nothing new to the arguments that were rejected in *State v. Bethel*, 275 Kan. 456, 66 P.3d 840 (2003). While stare decisis is a valid tack, the majority conveniently overlooks a significant distinction between this case and *Bethel*. Although Bethel was convicted of capital murder, the death penalty was not involved. "Pursuant to an agreement of the parties, Bethel waived his right to a jury trial, the case was tried to the bench on stipulated facts, and the State did not pursue the death penalty." 275 Kan. at 457.

Recently, we acknowledged that this court is supposed to employ a higher degree of scrutiny in a death penalty case. We stated:

"This court has, in several cases, noted that issues in a death penalty review are subject to a heightened reliability standard. See, *e.g.*, *Carr*, 300 Kan. at 284 (recognizing need for heightened reliability); *State v. Scott*, 286 Kan. 54, 76, 183 P.3d 801 (2008) (same); *State v. Green*, 283 Kan. 531, 545, 153 P.3d 1216 (2007) ('[I]n the context of a capital sentence, this court has required a heightened degree of reliability.'); *Marsh*, 278 Kan. at 525 ('[T]here is a heightened scrutiny of trial proceedings in a capital case.'); *Kleypas I*, 272 Kan. at 1036 (observing 'heightened reliability requirements' apply to capital sentencing under federal and state constitutions).

"A sentence of death is different from any other punishment, and accordingly there is an increased need for reliability in the determination that death is the appropriate sentence. See *Beck*, 447 U.S. at 637-38 (recognizing that a death sentence is a '"different kind of punishment from any other which may be imposed in this country . . . in both its severity and its finality"' [quoting *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)]; court has duty to set aside procedures that undermine the

59

reliability of the jury's determination)." *State v. Kleypas*, 305 Kan. 224, 274-75, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

At the very least, this court has the obligation to independently analyze whether the procedure of replacing the insanity defense with the mens rea approach undermines the reliability of the jury's determination to impose the death penalty. One might question whether a juror would be as likely to vote to kill a defendant who did not know that his or her murderous act was wrong.

ISSUE # 5: LESSER INCLUDED OFFENSE INSTRUCTION ON FELONY MURDER

The majority follows recent precedent to opine that the legislature retroactively eliminated felony murder as a lesser included offense of capital murder. One can certainly make a logical argument for the proposition that eliminating felony murder as a lesser offense of capital murder effectively changes the definition of the crime of capital murder, and, although the legislature is entitled to change the definition of a crime, it cannot redefine the crime after it is committed. Nevertheless, that is the settled law in this state now.

ISSUE #6: LIMITATIONS ON DEFENSE VOIR DIRE

I have no quibble with the majority's holding that the district court did not impermissibly limit the defense's voir dire of the jury panels given the record before the court and defense counsel's failure to conduct individual voir dire of venire members.

ISSUE #7:  CUMULATIVE ERROR DURING THE GUILT PHASE

I discern that the following judicial acts constitute multiple guilt-phase trial errors, to-wit:  (1) Giving the jury instruction after opening statements with accompanying remarks about it being unusual; (2) sustaining the State's objection during the defense closing argument, thereby precluding argument on the admitted Life Alert tape recording; (3) discouraging the jury from submitting questions during its deliberations; and (4) refusing to give the legally appropriate and factually supported expert witness instruction proffered by the defense.

Notwithstanding the existence of more than one error, I would not hold that their collective effect requires reversal of the guilty verdict. But I strongly disagree with the majority's determination that the guilt-phase errors can be ignored when considering the same jury's penalty-phase decision. Our heightened reliability obligation mandates that we not approve a sentence of death that is obtained through erroneous procedures. I would hold that the errors made in this case undermined the reliability of the jury's death sentence, and I would require that it be vacated and remanded for a new sentencing trial. A death sentence that fails the unreliable procedures test cannot pass constitutional muster, even if the majority believes that a subsequent trial would yield the same result.

ISSUE #8:  EIGHTH AMENDMENT CATEGORICAL CHALLENGE TO DEATH PENALTY

The majority relies exclusively on *Kleypas*, 305 Kan. 224, to reject Kahler's argument that it is cruel and unusual punishment under the Eighth Amendment to the United States Constitution for the State to kill a person who was severely mentally ill at the time of the capital murder. I did not specifically address this issue in my *Kleypas* dissent, but I do so now.

Fifteen years ago, in *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002), the United States Supreme Court construed and applied the Eighth Amendment "in the light of our 'evolving standards of decency,'" and concluded that imposing the death penalty on a mentally retarded offender was excessive and "that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." While recognizing that a preferred label is intellectual disability, see *Hall v. Florida*, 572 U.S. ____, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014), in K.S.A. 2016 Supp. 21-6622, for clarity I will use the terms employed in *Atkins* and *Kleypas*, i.e., mental retardation and mentally retarded.

Part of the rationale for *Atkins*' holding was that the Court seriously doubted that either of the two justifications for the death penalty that it had recognized—retribution and deterrence—could be applied to mentally retarded offenders. 536 U.S. at 318-19 (citing *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S. Ct. 2909, 49 L. Ed. 2d 859 [1976] [joint opinion of Stewart, Powell, and Stevens, JJ.]). The Court opined that "[u]nless the imposition of the death penalty on a mentally retarded person 'measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment.'" *Atkins*, 536 U.S. at 319; cf. *State v. Robinson*, 303 Kan. 11, 355-56, 363 P.3d 875 (2015) (Johnson, J., dissenting) (citing *Glossip v. Goss*, 576 U.S. ___, 135 S. Ct. 2726, 2764-68, 192 L. Ed. 2d 761 [2015] [Breyer, J., dissenting] "'the death penalty's penological rationale in fact rests almost exclusively upon a belief in its tendency to deter and upon its ability to satisfy a community's interest in retribution'"; if death penalty fails to reach the goals of deterrence or retribution, it is unconstitutional punishment), *cert. denied* 137 S. Ct. 164 (2016).

In reaching its conclusion that it was "not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty," *Atkins*, 536 U.S. at 321, the Court engaged in the following analysis:

"With respect to retribution—the interest in seeing that the offender gets his 'just deserts'—the severity of the appropriate punishment necessarily depends on the culpability of the offender. Since *Gregg,* our jurisprudence has consistently confined the imposition of the death penalty to a narrow category of the most serious crimes. For example, in *Godfrey v. Georgia,* 446 U.S. 420 (1980), we set aside a death sentence because the petitioner's crimes did not reflect 'a consciousness materially more "depraved" than that of any person guilty of murder.' *Id.,* at 433. If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.

"With respect to deterrence—the interest in preventing capital crimes by prospective offenders—'it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation,"' *Enmund,* 458 U.S., at 799. Exempting the mentally retarded from that punishment will not affect the 'cold calculus that precedes the decision' of other potential murderers. *Gregg,* 428 U.S., at 186. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to

63

offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence." 536 U.S. at 319-20.

The *Kleypas* majority "recognize[d] that some mental illnesses may make a defendant less culpable and less likely to be deterred by the death penalty." 305 Kan. at 336. Notwithstanding the self-serving equivocation in that recognition, it nevertheless points out the logical fallacy in categorically protecting the mentally retarded but not the severely mentally ill. *Atkins* spoke about mentally retarded offenders being less morally culpable because of their "diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses," as well as not being amenable to deterrence. 536 U.S. at 320. I fail to grasp how a severely mentally ill person possessing those same characteristics is not in the same less-morally-culpable category as the mentally retarded offender. If a person is incapable of understanding the nature and quality of their murderous act and/or did not know that the act was wrong, does it matter whether the cause of the cognitive deficiency is labeled mental retardation or chronic mental illness? The point is that, when executing a severely mentally ill person will not "measurably advance the deterrent or the retributive purpose of the death penalty," it becomes "nothing more than the purposeless and needless imposition of pain and suffering." 536 U.S. at 319, 321.

*Kleypas* strained to distinguish severe mental illness by declaring that the condition presents "less discernable common characteristics than age or mental retardation." 305 Kan. at 336. The apparent suggestion was that the courts might have to work more diligently to identify which mentally ill persons are less culpable. That argument is unpersuasive, if for no other reason than the notion that a person's life—even a murderer's life—should not be taken away without this court's heightened scrutiny, even if that takes more effort.

64

But, more importantly, I do not accept the premise. This state has decades of jurisprudence applying the *M'Naghten* rule. Determining whether a person was so severely mentally ill at the time of the crime as to render him or her less culpable is not much of a leap from that former knowing-right-from-wrong jurisprudence. Likewise, the argument falters when one considers that intellectual disability in this state is not determined through a mathematical calculation, but rather the condition requires a case-by-case determination as well. See *State v. Corbin*, 305 Kan. 619, 620, 386 P.3d 513 (2016) (remanding for district court findings on matters beyond standardized intelligence tests).

Moreover, I must confess to being baffled by the point *Kleypas* attempted to make by stating that "often such [mental] illnesses can be treated and may not manifest in criminal behavior." 305 Kan. at 336. If the suggestion is that mental retardation and being underage *always* manifests in criminal behavior, that would, of course, be ludicrous. The fact that not all mentally ill persons engage in criminal activity is no more compelling than the fact that not all mentally retarded persons are criminals. Moreover, if the statement means to suggest that mentally retarded persons can never receive training that will permit them to peacefully exist in society, that, too, would be wrong-headed.

Finally, *Kleypas'* rationale that the problem of executing severely mentally ill persons is ameliorated because mental illness can be presented to the jury as a mitigator does not pass cursory consideration. Would telling a juror that the defendant suffers from a severe mental illness that resulted in him or her killing people without knowing it was wrong, suggesting that the defendant will always be a danger to society, make the juror more, or less, likely to vote for death? If it is morally and legally wrong to execute a person who is no more culpable than *Atkins'* "average murderer," the decision to do so should not be left in the emotionally charged hands of the jury.

65

ISSUE #9:  CONSTITUTIONALITY OF TWO AGGRAVATING FACTORS

I concur with the majority's determination that the issues raised here were previously decided adversely to Kahler, and I see no reason to attempt to avoid the doctrine of stare decisis today.

ISSUE #10:  SUFFICIENCY OF THE EVIDENCE OF AGGRAVATING CIRCUMSTANCE

I would agree with the majority's assessment that this case presents an exception to the general proposition that shooting deaths are not inherently heinous, atrocious, or cruel. A person who stalks and systematically shoots his wife and daughters, one after the other, whereupon each remains aware of her own impending death and the deaths of her relatives has committed capital murder in a heinous, atrocious, and cruel manner.

OTHER UNASSIGNED ERRORS

Kahler does not challenge the constitutionality of Kansas' death penalty law under our State Constitution. See Kan. Const. Bill of Rights, § 9 (prohibiting "cruel or unusual punishment"). But as noted above, we can—and should—consider unassigned errors that impact on fairness and justice. In *Robinson*, 303 Kan. at 351-57, I expressed my view that the death penalty violates the prohibition against cruel or unusual punishment in our State Constitution. I relied heavily on Justice Breyer's dissent in *Glossip*, 135 S. Ct. at 2755-77, which I summarized as follows:

> "The *Glossip* dissent opined that in 1976, when the United States Supreme Court upheld the death penalty, 'the Court thought that the constitutional infirmities in the death penalty could be healed,' and it 'delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems.' 135 S. Ct. at 2755 (Breyer, J., dissenting). But '[a]lmost 40 years of studies, surveys, and experience

66

strongly indicate . . . that this effort has failed.' 135 S. Ct. at 2755 (Breyer, J., dissenting). The dissent related that the current administration of the death penalty 'involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose.' 135 S. Ct. at 2755-56 (Breyer, J., dissenting). Moreover, the dissent noted that, perhaps as a result of these constitutional defects in the death penalty, 'most places within the United States have abandoned its use,' which makes the penalty 'unusual.' 135 S. Ct. at 2756 (Breyer, J., dissenting)." *Robinson*, 303 Kan. at 351-52 (Johnson, J., dissenting).

The only thing I would add here is the obvious observation that a part of what makes the death penalty unfair and unjust is that the degree of certainty that a jury must possess to vote for the death penalty does not match the finality of the punishment, once executed. A jury can convict a person of capital murder without being certain that the person is guilty. Indeed, prosecutors frequently argue to juries that the beyond a reasonable doubt standard of proof does not mean beyond *all* doubt. Then, in the sentencing phase, the same less-than-certain standard is applied to the existence of aggravating factors, which must then be *outweighed* by mitigating circumstances. K.S.A. 2016 Supp. 21-6617.

But there is nothing uncertain about the punishment of death. There is no taking back a completed execution, even if we learn that the jury was hoodwinked by unscrupulous forensics, sandbagged by unethical prosecutions, or left less than fully informed by inconceivably incompetent defense counsel. In recent years, death row inmates have been found to have been wrongfully convicted for a plethora of reasons. Moreover, after a death sentence is executed, it matters not one whit whether the sentence was unconstitutionally imposed. For instance, there was no relief for all of the mentally retarded offenders put to death before the *Atkins* court announced that it was unconstitutionally cruel and unusual punishment to do so. Likewise, the 22 juvenile

67

offenders put to death between 1985 and 2003 were not brought back to life by *Roper*'s epiphany that a state executing its children is categorically unconstitutional. See *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

In short, when it comes to our death penalty, the scales of justice are not in equipoise. That is cruel.